741 F.2d 165
 Darin DUNLAP, a minor by his guardian of his person, Carolyn
Sue WELLS, and by the guardian of his estate,
Texas Commerce Bank of Arlington,
v.
Thomas L. BUCHANAN, M.D. and Thomas Buchanan, M.D., P.A.
 No. 83-2057.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 12, 1984.
Filed Aug. 10, 1984.
 
 The McMath Law Firm, P.A., Little Rock, Ark., for appellant.
 W.A. Eldredge, Jr., and Laura A. Hensley, Friday, Eldredge & Clark, Little Rock, Ark., for appellee.
 Before BRIGHT, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 The issue before us is whether Darin Dunlap, who is eight years old and severely mentally retarded, is a citizen of Texas for the purpose of invoking diversity jurisdiction under 28 U.S.C. Sec. 1332 (1982). The district court,[1] 567 F.Supp. 1435 (D.C.Ark.1983), held that the move of Darin from Arkansas to Texas, where he was placed in a special care home, was not sufficient to effect a change in citizenship. The district court relied upon the rule that the domicile of the child is that of the parents, and Darin's parents remained in Arkansas. On appeal it is argued that a separate, permanent residence has been established for Darin in Texas, with guardians of Darin's person and estate appointed there, and that he is therefore a citizen of Texas for diversity purposes. We affirm the judgment of the district court dismissing the complaint for lack of jurisdiction.
 
 
 2
 Darin was born in June, 1976, and this litigation stems from the malpractice suit brought by his father on his behalf against the attending physician, Dr. Thomas L. Buchanan. The complaint alleged that Dr. Buchanan negligently inflicted catastrophic brain injuries upon Darin in the course of delivery, resulting in permanent and total disability. The suit was filed on October 21, 1980, in Conway County Circuit Court, and later amended to include as an additional plaintiff the First State Bank and Trust Company of Conway, Arkansas, as guardian of Darin's estate. The suit was dismissed without prejudice on the motion of the plaintiff on May 20, 1982.
 
 
 3
 In June of 1982, Darin was moved to Hurst, Texas, where his aunt, Carolyn Sue Wells, was appointed guardian of his person. The Texas Commerce Bank of Arlington, Texas, was appointed guardian of his estate, while the Arkansas guardianship was dismissed. These Texas guardians brought an identical suit on Darin's behalf against the doctor, an Arkansas citizen, in the United States District Court for the Eastern District of Arkansas. The district court, in its order of dismissal, made the following findings concerning the move:
 
 
 4
 In June, 1982 Darin's mother took him to Hurst, Texas where they stayed with his aunt, Carolyn Sue Wells, while Darin had surgery on July 6, 1982 at the Children's Medical Center in Dallas. On October 5, 1982 Darin was moved into a home owned by Ms. Lee Baber which is licensed to care for mentally retarded children by the State of Texas. The Baber home is located in Dallas where Darin attends a special school for the handicapped during the day. Ms. Baber charges $367.00 per month to keep Darin (she also keeps two other retarded children in the four bedroom house). Because Darin is retarded he receives a monthly Supplemental Security Income check from the Federal Government which together with the $82.70 Darin's parents pay each month makes up the $367.00. Ms. Baber stated in her deposition that Darin's parents are responsible for his medical and dental bills.
 
 
 5
 * * *
 
 
 6
 * * *
 
 
 7
 Although Darin's mother and sister stayed in Texas during the summer of 1982 with Ms. Wells, his sister returned to school in Arkansas in the fall and his mother returned after he was placed in the Baber home. At no time did his father leave the family home in Conway County, Arkansas. Although Mrs. Dunlap stated in her deposition that she and Darin had "moved to Texas" she also stated that her sole purpose there was to find a placement for Darin after which she planned to return to Arkansas (Dunlap deposition p. 10).
 
 
 8
 The district court rejected the arguments that Darin's move to Texas was a bona fide change of residency, concluding that his domicile was the same as that of his parents and that diversity of citizenship as to the defendant was therefore lacking. On appeal the guardians persist in their argument that Darin's move to Texas was a change of domicile sufficient to create diversity.
 
 
 9
 Our review of the district court's decision is limited. "A determination of citizenship for purposes of diversity is a mixed question of law and fact, but mainly fact, which may not be set aside by an appellate court unless clearly erroneous." Rogers v. Bates, 431 F.2d 16, 18 (8th Cir.1970) (citing Russell v. New Amsterdam Casualty Co., 325 F.2d 996 (8th Cir.1964); Janzen v. Goos, 302 F.2d 421 (8th Cir.1962)). State citizenship for the purpose of diversity jurisdiction is equated with domicile. Russell, 325 F.2d at 998; C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure, Jurisdiction Sec. 3611 (1975); see Williamson v. Osenton, 232 U.S. 619, 624, 34 S.Ct. 442, 442, 58 L.Ed. 758 (1914). In Rogers, the appellant failed to demonstrate that the district court clearly erred in determining that the person in question "had acquired no citizenship in Colorado and that he remained domiciled in and a citizen of Nebraska * * *." 431 F.2d at 18.
 
 
 10
 The domicile of a minor is generally determined by reference to another person because minors are legally incapable of forming the requisite intent to regard a place as a home; however, it is Darin's domicile, not that of his guardians, that determines whether diversity jurisdiction exists. See C. Wright, A. Miller & E. Cooper, supra, Sec. 3615. The general principles surrounding the question before us were stated succinctly and well by the district court:
 
 
 11
 "When a legitimate child is born of a living father, its domicile is that of its father, and thereafter the child until its majority ordinarily continues to have the domicile of its father ... regardless of whether the child actually lives with its father or not." American Conflicts Law, 3rd Ed., Sec. 12.
 
 
 12
 "An infant who is insane has the domicile of his parents, like any other minor." Id. Sec. 13.
 
 
 13
 Arkansas courts follow these general rules. In re Watson, 99 F.Supp. 49 (D.C.Ark.1951).
 
 
 14
 The district court further observed that minors retain their parents' domicile when they attend school in a different state but continue to be supported by their parents and to see them when school is not in session. Lyons v. Salve Regina College, 422 F.Supp. 1354 (D.R.I.1976), rev'd on other grounds, 565 F.2d 200 (1st Cir.1977), cert. denied, 435 U.S. 971, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978). The court also pointed out that an incompetent person's domicile must be determined by reference to another. The court discussed Chew v. Nicholson, 281 F. 400 (D.Del.1922), in which a mentally incompetent Delaware woman institutionalized in Pennsylvania was held not to have capacity to change her domicile from that of her parents in Delaware, even though she resided in Pennsylvania for over sixty years until her death.
 
 
 15
 These general principles do not require us to adopt an unbending rule that a child such as Darin can never, under any circumstances, have a domicile other than that of his parents. Indeed it is entirely possible that a child may be shown by the evidence to have adopted such a domicile. In Elliott v. Krear, 466 F.Supp. 444 (E.D.Va.1979), the minor plaintiff's divorced mother, who had legal custody of him, was domiciled in California. The court held that the minor was domiciled in Virginia, however, because his mother had left him in the actual custody of his Virginia grandparents, who cared for him and were paying for all of his support. See also Spurgeon v. Mission State Bank, 151 F.2d 702 (8th Cir.1945), cert. denied, 327 U.S. 782, 66 S.Ct. 682, 90 L.Ed. 1009 (1946) (emancipated minor may acquire domicile of own choice).
 
 
 16
 In the present case, the guardians argue that because Darin now resides in Texas and because his appointed legal guardians are Texas citizens, he is domiciled in Texas. The guardians' reliance upon Restatement (Second) of Conflicts of Law Sec. 22 (1971), however, is misplaced. Comment (h) to section 22 states: "If the ward lives with the guardian in the state of appointment, he takes the domicil of the guardian. If he does not live with the guardian he does not take the latter's domicil." Here, while Darin lives away from Arkansas, he lives with neither of his legal guardians. The issue then, as the court in Elliott v. Krear recognized, is a factual question of where, considering the mosaic of circumstances surrounding Darin's care and control, he is domiciled. The district court found that Darin's parents continued in their parental roles notwithstanding the appointment of Darin's Texas guardianships:
 
 
 17
 The Arkansas guardianship was dismissed on January 28, 1983. The Texas bank was appointed guardian of Darin's estate solely to receive any proceeds from this litigation. Plaintiff's counsel made this point quite clear in his brief. It is abundantly evident from the depositions of Ms. Dunlap, Ms. Baber and Ms. Wells that Ms. Wells and her husband as guardians of his person have not exercised any control over Darin. He never stayed in the Wells home unless his mother was present also. Ms. Wells has made no decisions regarding Darin's welfare, perceiving her role as taking "his mother's place when she's not here...." (Wells depo. p. 46). She didn't know the name of Darin's school nor the name of his doctor. She indicated that the length of Darin's stay at Ms. Baber's home was ultimately the responsibility of his mother. Mr. and Mrs. Wells appear to have done nothing more than give Darin's mother a place to stay when she is in Texas to visit Darin and to check on him each month. Darin's parents remain financially responsible for him and have exercised traditional parental control over him (Wells depo. pp. 27-40).
 
 
 18
 Thus, the district court's findings as to the Texas guardianships did not compel it to make an exception to the general rule that Darin's domicile should follow that of his parents.
 
 
 19
 Another consideration in determining a minor's domicile is whether the purposes of diversity jurisdiction are served by the choice. In Ziady v. Curley, 396 F.2d 873 (4th Cir.1968), the court held that the minor plaintiff was domiciled in New Jersey, where he went to live with his mother and stepfather when his father, with whom he had been living in North Carolina, died. In rejecting the common law view that the minor's domicile remains in the state of the father, the court stated:
 
 
 20
 [O]ne of the principal purposes of diversity jurisdiction was to give a citizen of one state access to an unbiased court to protect him from parochialism if he was forced into litigation in another state in which he was a stranger and of which his opponent was a citizen. * * * The infant plaintiff, for all practical purposes, and for the specific purpose envisioned by the founding fathers, is a stranger to the State of North Carolina.
 
 
 21
 In contrast to Ziady, the district court found that the purposes of diversity jurisdiction would not be served by holding Darin to be a Texas domiciliary.
 
 
 22
 We need not address defendant's argument under McSparran v. Weist, 402 F.2d 867 (3d Cir.1968), cert. denied, 395 U.S. 903, 89 S.Ct. 1739, 23 L.Ed.2d 217 (1969), that Darin's Texas domicile was "manufactured." The district court's findings of fact regarding Darin's domicile did not rely upon any showing of impropriety or collusion. Nor do we discern any legal support for plaintiffs' related argument that Darin's parents' intention that Darin be domiciled in Texas is controlling.[2]
 
 
 23
 Analyzing this question of domicile under Rogers v. Bates, supra, as one of mixed law and fact, we must conclude upon examination of the record that the district court's determination of Darin's citizenship was not clearly erroneous. Darin was admitted to the Human Development Center in Conway, Arkansas, in March, 1980, and resided there until the move to Hurst, Texas. His parents have continuously maintained their home in Morrilton, Arkansas, and there is no indication that they have intended to make their home in Texas. The father evidently never went with the family to Texas for any extended period. The home in which Darin resides in Texas is permanent, but Mrs. Baber, who maintains the home, testified that she is only licensed to provide for children up to age twelve. Darin's parents continue to visit him and bring him to Arkansas on weekends and holidays. They have continued to provide for his support, education, and medical treatments. By contrast, Mrs. Wells, the guardian of his person, has taken no action or assumed any responsibility as guardian other than signing papers from Mrs. Baber that had been previously executed by Mrs. Dunlap. Mrs. Wells perceives her role as taking Darin's mother's place when she is unavailable and handling emergencies. She has had nothing to do with arranging for Darin's education nor does she know the names of his physicians. These facts underscore our conclusion that the district court's determination of Darin's domicile was not clearly erroneous.
 
 
 24
 We affirm the judgment of the district court.
 
 
 
 [1]
 The Honorable Elsijane T. Roy, United States District Judge for the Eastern District of Arkansas
 
 
 [2]
 Plaintiffs' reliance upon Chew v. Nicholson, supra, is unfounded. There the court assumed, without deciding, that an insane person's guardian could alter that person's domicile. In so doing, the court expressly distinguished an insane person's guardian from a child's father, who has no such power:
 In the case of father and child, the infant's domicile follows that of the father; but a father cannot give his son a domicile apart from his own.
 
 
 [281]
 F. at 405 (quoting Dicey, Conflict of Laws, 2d ed. at 149)